IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | CASE NO.: |
| | : | 1:18-CR-00242-AT-LTW-1 |
| | : | |
| ROSA FITZHUGH, | : | |
|     Defendant. | : | |

### BRIEF IN SUPPORT OF IMPOSITION OF A REASONABLE SENTENCE BELOW THE GUIDELINE RANGE

Comes now Defendant, Rosa Fitzhugh, by and through undersigned counsel and hereby respectfully requests the Court impose a reasonable sentence, below the determined Guideline range.

### Legal Analysis

Since the Supreme Court's holding in United State v. Booker, 124 S. Ct. 738 (2005), the Guidelines may no longer be utilized in a mandatory manner. The sentencing court is still required to correctly apply and calculate the Guidelines as applied to the facts of the case, however, the court may deviate from the Guidelines in arriving at a reasonable sentence in consideration of the sentencing factors enumerated in 18 U.S.C. §3553(a)(1).

Applying the holding in Booker, the Eleventh Circuit in United States v. Crawford, 407 F3d 1174 (11th Cir. 2005), held:

> Although under Booker, the Sentencing Guidelines are an advisory rather than a mandatory regime, the district court remains obliged to "consult" and "take into account" the Guidelines in sentencing.... In other words, as was the case before *Booker*, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a

district court "effectively means that [the district court] has not properly consulted the Guidelines.... After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable..."

Id. at 1178-79.

The court in United States v. Jordi, 418 F.3d 1212 (11th Cir. 2005), made clear the responsibility of the trial court to first accurately calculate the Guideline sentence, including the application of enhancements and encouraged departures, prior to a Booker reasonableness analysis.

The Supreme Court decisions in United States v. Kimbrough, 128 S. Ct. 558 (2007) and Gall v. United States, 128 S. Ct. 586 (2007), provide further guidance to the sentencing courts about the methodology to be employed in evaluating the Guidelines and the §3553(a) factors in arriving at a reasonable sentence.

In Kimbrough, the Supreme Court upheld the sentencing court's consideration of the sentencing disparity between powder cocaine and crack cocaine. The district court had concluded the Guideline range was greater than necessary to achieve §3553(a)'s purposes.

In Gall, the Supreme Court rejected the Eighth Circuit's determination that a deviation of the magnitude in Gall's sentencing required "exceptional circumstances." The Court rejected the application of any such "exceptional circumstances" standard. The Court also rejected any kind of mathematical formula that would require an "extraordinary" justification for a sentence that deviates dramatically from the Guideline range. The Court went on to hold that a sentencing judge should explain why a sentence has been imposed outside the Guideline range. In determining that an unusually lenient sentence is appropriate in a particular case, the district court must provide

sufficient justifications on the record. The Court further directed that a major departure should be supported by a more significant justification than a minor one.

The Court explained the review process to be employed by the court of appeals in reviewing sentences imposed outside the Guidelines:

"Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion-standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness... But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." <u>Gall</u>, 128 S. Ct. at 597; see also <u>United States v.</u>

Winingear, 422 F.2d 124 (11th Cir. 2005) (Eleventh Circuit applied the reasonableness standard on review).

### **Reasonableness as Applied to Rosa Fitzhugh and This Case**

18 USC § 3553(a) states in pertinent part:

(a) "Factors to be considered in imposing a sentence.–The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection. The Court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...

(5) any pertinent policy statement....

(6) the need to avoid unwarranted sentence disparities among the defendants with similar records who have been found guilty of similar conduct, and

(7) the need to provide restitution to any victims of the offense."

### I.     The Nature and Circumstances of the Offense and Characteristics of the Defendant

Ms. Fitzhugh is a forty-six year old, single mother of three (3) children.  The two oldest children are adults, and the youngest child is less than one (1) year old.  In addition to her youngest child, Ms. Fitzhugh also is the primary caretaker for her mother who suffers from heart and lung disease.  Ms. Fitzhugh has born in Santa Domingo, Dominican Republic, where she lived until she was four (4) years old before immigrating with her family to New York.  Ms. Fitzhugh remains a citizen of the Dominican Republic and is a Permanent Resident in the United States

Ms. Fitzhugh completed her high school education in New York before joining the United States Military.  After her discharge and following her move to Atlanta, Ms. Fitzhugh continued her education, receiving an Associate's Degree, Bachelor's Degree, and two (2) Master's Degrees.  Ms. Fitzhugh worked for seventeen (17) years in the Dekalb County School System as a teacher and counselor.  With her education and work experience with children, Ms. Fitzhugh set out to create a service that would assist children and families with psychological and/or academic needs.  From that dream was born Casa Luisa.

Ms. Fitzhugh started her company from the ground up, initially providing all the services herself and wearing all the hats.  In addition to individual services, Casa Luisa also provided summer camps for children. Over time, Ms. Fitzhugh added support staff and her company grew into an agency.  In 2013, Ms. Fitzhugh was contacted by WellCare and was informed that she could not operate as an agency as she was only a "sole provider".  This issue involved Ms. Fitzhugh

using staff to provide services. As a result of the issues raised, Ms. Fitzhugh repaid $77,000 over a period of nine (9) months, but nonetheless was terminated from WellCare.

From 2013 to 2015, Ms. Fitzhugh operated again as a sole provider, albeit with Amerigroup and Peachstate, and not WellCare. In 2015, Ms. Fitzhugh went to a training for Licensed Profession Counselor's in Mableton, Georgia. From that training session, Ms. Fitzhugh came away with the understanding that if an individual is a Certified Supervisor Counselor, which Ms. Fitzhugh is, then she could partner with Licensed Professional Counselors ("LPC") that have agencies. Ms. Fitzhugh placed an advertisement on an industry website for other LPC's that could supervise staff and read notes. This resulted over time in Ms. Fitzhugh partnering with LPC's and their agencies, specifically, Theresa Houston and TK Consultants, Nikki Crumbley and Crumbley Counseling, Shevander Dykes and Surviving Transitions, Adrian White and White Counseling, Inc., and Larry Hooks and TRM Consultants.

Once the partnerships were in place, Ms. Fitzhugh assigned Casa Luisa staff to each LPC and their respective agency. Casa Luisa in effect became a staffing agency for the LPC's and their agencies. Casa Luisa provided the clients (children and families), handled all the billing, and paid all the LPC's and staff for the services provided to the children and families, as well as associated expenses. The LPC's and their staff became responsible for diagnosing the children, seeing the children, documenting the visits, monitoring the children, and creating the counseling notes for each child/patient. Specifically as to the billing, Casa Luisa handled all billing for Peachstate and Amerigroup. But because of Ms. Fitzhugh's earlier termination by WellCare, the LPC's did their own WellCare billing. As such, Casa Luisa handled approximately 60% of all billing, whereas the LPC's did the remaining 40% of billing to WellCare. Even when Theresa Houston/TK consultants was being audited by Amerigroup for nine (9) months and payments were issued, Ms. Fitzhugh

continued to pay all the TK consulting staff who, in turn, were still providing services to children and families.

All the LPC's and their respective agencies understood the arrangement they had with Casa Luisa. None of the LPC's were recruited by, or directed by, Casa Luisa to do anything illegal. The LPC's knew how billing was handled, which staff member was seeing the children, indeed at the direction of the supervising LPC, and the billing codes that were used. And herein lies the issue that brings Ms. Fitzhugh before this Court. Ms. Fitzhugh was having difficulties with determining the proper billing codes for the services provided, and the proper billing code for non-LPC staff member who was providing the service. Ms. Fitzhugh contacted Amerigroup about these billing issues and was repeatedly referred to the Amerigroup website and the Georgia Department of Behavioral Health and Developmental Disability Manual. What Ms. Fitzhugh did not receive was specific instructions on billing. The Government will contend, and Ms. Fitzhugh acknowledges, that it was her responsibility to ascertain and use the proper billing codes and provide the appropriate services, and Ms. Fitzhugh failed to do so. The Government will also contend, and Ms. Fitzhugh will also acknowledge, that the agency staff seeing the children were not authorized to do so based on their education and certifications.

What is important to understand is that Medicare numbers were provided by families, children were seen by LPCs or other staff and services were provided, albeit with the errors discussed above. Initially the Government took the position that identities were stolen. Ms. Fitzhugh denied this accusation. Through her counsel and investigator, who met with every family in which the accusation of identity fraud was levied, Ms. Fitzhugh was able to provide statements that all parents willingly provided Medicare numbers for their children. The reality is that many of the families assisted by Casa Luisa were low income and many of the parents were under

educated. As such, there may have been some misunderstanding as to the nature of the intended services for the children. But this is far removed from fraudulently stealing Medicare numbers to create phantom patients. Similarly, services were not billed on dates when children were not seen.

The Government has provided a grossly inflated loss amount, which is not atypical for Medicaid/Medicare fraud cases. And this occurs for a number of reasons. First, the providers do not pay for all the billed services. The asserted gross loss amount of $2.4 million was not paid to Casa Luisa, and there was never an expectation that this amount would be paid. A loss calculation based upon the billed number incorrectly assumes that what is billed is paid. Second, in the case at hand, a substantial percentage of what was paid to Casa Luisa was in turn paid to LPC's and staff for services provided, as well as operating expenses. Ms. Fitzhugh paid herself no more than fifteen percent (15%) of what Casa Luisa received in revenue. The complicating matter in this analysis is to provide this Court with a specific loss amount that takes into account a calculus of the following factors; how much of what was billed by Casa Luisa was actually paid by the providers, what is the accurate value of the services provided (as opposed to services billed), and how much of what was paid did Ms. Fitzhugh retain. As such, Ms. Fitzhugh can only make an educated guess as to the appropriate loss amount and has done so in her objections to the Pre-sentence Report, arriving at a figure between $250,000 and $550,000. This figure takes into account that actual therapeutic services were provided to every child. This figure is admittedly a guess, but so is the figure provided by the Government.

## II.      **The Seriousness of the Offense, the Promotion of Respect for the Law, and the Consideration of a Just Punishment**

Medicaid/Medicare fraud is a serious crime that occurs daily and results in substantial loss to taxpayers. But not all fraud is equal and should not be treated as such. And whereas the

Sentencing Guidelines provide a guideline calculation based primarily on loss amount, the Guidelines do not account for the difference between outright fraud in which no patients are seen and/or no services are provided, and the type of fraud in the case at hand. Ms. Fitzhugh did not create a program intended to engage in fraud. Ms. Fitzhugh did not operate a service whose intention it was to steal. Ms. Fitzhugh invested her time and resources into helping children, and no one can sincerely deny that children received beneficial, therapeutic services from Casa Luisa and its partner LPC's and agencies. Children benefitted from the relationships with Casa Luisa and its partners. Families benefitted from the relationships. Children made progress through these relationships and the services provided. To quantify the entire billed amount as an accurate loss amount is to argue that no service of any value was every provided to any child or family. This is not only inaccurate, but it is an overly simplistic analysis which ignores that there were real people aided by Casa Luisa and its partners.

None of this analysis is meant to deny an acceptance of responsibility for the crimes committed by Ms. Fitzhugh, but providing context for a crime is an appropriate consideration for this Court. Just as not all fraud is the same, neither are all crimes or the people who commit them. Ms. Fitzhugh accepts her legal responsibility and recognizes that she bore the responsibility as the billing party to make sure all billing was done accurately and within the accepted rules and regulations. Her failure to do so is why she is before this court for sentencing.

Punishment is difficult to determine in many fraud cases, but more so when the person committing the crime received so little of the proceeds. Even if we accept a loss amount of $2.4 million based on the billed amounts, and even if we assume the providers paid all of what was billed, Ms. Fitzhugh's fifteen percent (15%) was only $360,000. Fraud of the garden variety; phantom patients, phantom services and corresponding phantom billing, is meant to enrich the

fraudster, not pay the bills of the staff. So what this Court is left with is a fraudster who made sure her staff was paid even when she was not. This point, albeit a minor one, is meant to provide some insight as to the thought process behind this particular fraud and why it differs from what this Court often sees.

Ms. Fitzhugh is not a future threat to society or any individual. And it is difficult to sincerely argue that she is a threat to commit crimes in the future. As a convicted felon, she will lose her license and never again engage in her profession. As a convicted felon who is a foreign national, she will be deported. These are forms of punishment beyond whether a person should be incarcerated and should be recognized as such.

### III.  Deterrence of Criminal Conduct

For reasons already discussed herein, deterrence of future criminal conduct is simply unnecessary for Ms. Fitzhugh. First, the loss of her professional license would make it seemingly impossible for Ms. Fitzhugh to engage in Medicaid/Medicare fraud, even if she desired to do so. Second, Ms. Fitzhugh's likely deportation removes her physical presence in this country. Third, Ms. Fitzhugh did not engage upon this course of conduct with the intention of committing crimes, as distinguished from someone who robs a bank or counterfeits money.

The jurisprudence following Booker and Kimbrough has recognized the appropriateness of a sentencing court focusing on the specific characteristics of a defendant in considering the application of a variance from the Sentencing Guidelines. In the present case, a prison sentence is neither required nor necessary to deter Ms. Fitzhugh from further criminal conduct, or to deter others who are similarly situated.

18 U.S.C § 3553(a) dictates that the sentence imposed should be sufficient, but not greater than necessary, to meet the pertinent sentencing consideration. Ms. Fitzhugh has comported

herself appropriately while on supervised release, and there is no reason to believe that she would not continue to conduct herself accordingly while on supervised release or some another form of alternative to incarceration.

This Court should give serious thought to a sentence comprised of a substantial period of supervised release, Home Confinement, or Half-way House.  This would meet all the punitive considerations, while also recognizing the uniqueness of this crime and the individuality of Ms. Fitzhugh and her circumstances.  Ms. Fitzhugh could continue to work in some capacity and pay down the restitution or fine imposed, and she could be a mother to her newborn, though the dark cloud of deportation would admittedly still be cast over this case no matter the sentence.  Supervision in some form would provide more than sufficient safeguards against any future criminal conduct by Ms. Fitzhugh, and would provide for substantial penalties if necessary.

The pendulum in this country had swung against the incarceration as the only acceptable form of punishment.  Incarceration has done little to nothing to reduce recidivism, yet its impact on families has been severe.  Incarceration is a sledgehammer when so many cases call for a scalpel.  Neither society nor this defendant would benefit from incarceration.  The use of incarceration would be little more than the rote application of numbers, used today because they were used in the past.  A variance from incarceration is appropriate in this case and for Ms. Fitzhugh.

This __14th____ day of __June_____, 2019.

Respectfully Submitted,

*/s/ Ash S. Joshi*_____
ASH S. JOSHI
Georgia Bar No.: 405375
Attorney for Defendant
Rosa Fitzhugh

66 Lenox Pointe, N.E.
Atlanta, Georgia 30324
404-968-2605 (phone)
404-968-2614 (fax)
joshilawfirm@msn.com

                                               ***/s/ Michael J. Trost***
                                               MICHAEL J. TROST
                                               Georgia Bar No.: 716685
                                               Attorney for Defendant
                                               Rosa Fitzhugh

1800 Peachtree Street
Suite 300
Atlanta, Georgia 30309
(404) 352-9300

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| v. | : | **CASE NO.:** |
| | : | **1:18-CR-00242-AT-LTW-1** |
| | : | |
| **ROSA FITZHUGH,** | : | |
|     **Defendant.** | : | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed the foregoing SENTENCING MEMORANDUM IN SUPPORT OF A REASONABLE SENTENCE with the District's CM/ECF service, which will cause a copy to be sent electronically to opposing counsel.

This __14th__ day of __June__, 2019.

                                Respectfully Submitted,

                                */s/ Ash S. Joshi*
                                ASH S. JOSHI
                                Georgia Bar No.: 405375
                                Attorney for Defendant
                                Renault Shinall

66 Lenox Pointe, N.E.
Atlanta, Georgia 30324
404-968-2605 (phone)
404-968-2614 (fax)
joshilawfirm@msn.com